## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

J.V. & Sons Trucking, Inc.,                      Case No. 0:20-cv-02538-KMM-BRT

                        Plaintiff,

v.

                                                 **ORDER**

Asset Vision Logistics, LLC,

                        Defendant.

This case involves a contractual dispute between Plaintiff J.V. & Sons Trucking, Inc. ("J.V. & Sons"), and Defendant Asset Vision Logistics, LLC ("AVL"). J.V. & Sons brought suit on June 24, 2020, alleging that AVL had breached its contractual obligations by failing make payments to J.V. & Sons for eight invoices memorializing trucking hauls. [Gleekel Decl., Ex. 55, ECF No. 71]. AVL counterclaimed, alleging that J.V. & Sons had breached its contractual obligations under a different agreement, the QuickPay Agreement ("QPA"), by taking actions inconsistent with its non-disclosure and non-solicitation clauses. [ECF No. 7]. Before the Court are cross-motions for summary judgment. [ECF Nos. 67 & 103]. For the reasons that follow, AVL's motion is denied, and J.V. & Sons' motion is denied in part and granted in part.

## I.      BACKGROUND

This case begins with a budding business relationship between J.V. & Sons, a hauling company, and AVL, a logistics broker which coordinates the hauling of crude

1

oil between trucking and oil companies. J.V. & Sons provided the trucks and the drivers; AVL brokered with third parties to provide dispatches for hauling jobs, and provided J.V. & Sons with e-ticketing software and logistics management, such as completing paperwork, Certificates of Insurance, and Access Agreements for each site.

In June 2019, Dan Kitchings, J.V. & Sons' field coordinator, introduced J.V. & Sons' president, Michael Conners, to Jason Barnett, an AVL employee. [Michael Conners Aug. 4, 2021 Dep., 69:13–24, ECF No. 73]. After a short phone call, the two agreed to work with one another. [*Id.* 76:1–7].

### A. The Hauling Relationship

J.V. & Sons cleared several logistical hurdles before starting to haul for AVL's clients, including AVL coordinating all of the necessary permissions for J.V. & Sons trucks to enter their clients' land. [*Id.* 44:8–14]. The two companies also negotiated the rates that AVL would pay J.V. & Sons for future hauling arrangements, which were memorialized in a rate agreement. [*See* Gleekel Decl., Ex. 9–11].

Throughout their relationship, J.V. & Sons and AVL negotiated six separate rate sheets, three for West Texas and three for East Texas. [Gleekel Decl., Exs. 90–98, "Rate Sheets"]. Each rate sheet determines how J.V. & Sons will be paid for its hauls. [Conners I, 138:14–23]. Each rate sheet lists the haul rates per mile in increments of five miles, the minimum number of oil barrels to be hauled, reject rate charges, split-ticket charges, wait time charge rates, high H2S charges, rough road charges, and extra

stop charges. The rate agreements themselves stated that the "*Rough Road charges round trip and per site and must be agreed upon in writing prior to assessing to freight bill."

A typical haul went something like this. An oil company contacts AVL with a hauling opportunity and provides the number of loads it wants hauled. AVL reaches out to one of its haulers' dispatches, such as the J.V. & Sons dispatch, with the opportunity. [Conners Dep., 130:6–12]. If J.V. & Sons accepts the dispatch, J.V. & Sons assigns a driver to complete the haul. [*Id.*] Certain details, such as the location, date, and time of pick-up or delivery, are sent through AVL's e-ticketing software to the drivers, and the driver completes the haul and prints a haul ticket memorializing the details of the haul. [*Id.* 130:1–25 (describing the typical haul)].

## B. The QuickPay Agreement

In July 2019, AVL suddenly switched its payment schedule. Originally, according to Mr. Conners, AVL indicated that it would pay J.V. & Sons within 15 days of receiving the invoice. [*Id.* 101:3–8]. But this changed over a phone call, when AVL informed J.V. & Sons that AVL would now pay invoices on a thirty-day time frame. [*Id.* 102:10–19].

By the end of July, after Mr. Conners spoke to Tyler, Jason Barnett, and AVL's president, Joshua Holwell, Mr. Holwell emailed Conners with a proposition. In order for JVL to receive payment "net-30," AVL would factor J.V. & Sons' invoices and pay them within 30 days, if J.V. & Sons signed a "QuickPay Agreement." [*Id.* 102:10–19].

The QuickPay Agreement ("QPA") states that it generally governs "the general terms and conditions under which, from time to time during the Term, Seller [(J.V. & Sons)] may offer and sell certain Receivables [(the invoices)] to Purchaser [(AVL)]." [QPA § 2.1, ECF No. 32]. Under this arrangement, AVL would pay J.V. & Sons an advance of 90% of the invoice price prior to payment from AVL's client. [*Id.* § 3.3]. Within ten days of receiving payment from its client, AVL would deduct 3% of the total invoice price as a fee for the factoring arrangement, and pay J.V. & Sons the remaining 7%. [*Id.* §§ 3.2, 3.4]. The agreement specified that when J.V. & Sons wanted to factor its invoices, it would send AVL an "Assignment and Transfer of Receivables" form, which was attached to the QPA, and AVL would send back an acceptance of the form with the advance payment. [*Id.* § 2.2].

The QPA contained several clauses that are relevant to these proceedings:

(1) An exclusivity clause, which prohibited J.V. & Sons from assigning its receivables to any other company. [*Id.* § 2.5].

(2) A choice-of-law clause, stating that the Agreement shall be construed and enforced in accordance with Texas state law. [*Id.* § 14.8].

(3) A Non-Solicitation clause, stating "During the Term and for a period of one hundred eighty (180) days following the Purchaser's last transaction with Seller, the Seller shall not, directly or indirectly, solicit or accept any business or enter into any business relationship in any way with: (a) any of

4

Purchaser's customers or (b) with any person or entity directly or indirectly introduced to Seller by Purchaser."

(4) A Non-Disclosure clause, stating "During the Term and thereafter, Seller agrees to hold all Confidential Information in strict confidence and agrees that it shall not (a) disclose any Confidential Information to any other person or (b) use any Confidential Information for the Seller's own benefit or for the benefit of any other person or entity, in each case without Purchaser's express prior written consent. For the purposes of this Agreement, 'Confidential Information' means all information, whether written or oral, that is disclosed or made available to Seller directly or indirectly, through any means of communication, including Seller's observations by virtue of opportunities provided to Seller by Purchaser." [*Id.* § 14.4].

(5) A provision to pay all fees, costs, and expenses associated with enforcing the agreement. [*Id.* § 11].

Breach of any of the above clauses was considered default under the QuickPay Agreement, which would entitle AVL to any remedies available under Texas law. [*Id.* § 6]. J.V. & Sons signed the QuickPay Agreement on August 6, 2019.

Over the next few months, AVL factored J.V. & Sons' invoices for hundreds of hauls. [Joshua Holwell Dep. 108:10–11, ECF No. 107-1]. However, according to Mr. Conners, AVL and J.V. & Sons never followed the explicit terms of the QPA.

J.V. & Sons would email AVL an invoice, AVL would email back an acknowledgment, and pay J.V. & Sons an advance 30 days after receipt. [Conners Dep. 231:1–232:2]. There is no evidence in the record that the parties filled out or used the Assignment and Transfer of Receivables Form to do so.

### C. J.V. & Sons Begins Hauling for Continental Logistics

This period of peaceful commerce did not last. As winter approached, the parties' relationship became strained. In January 2020, Jason Barnett, now an employee of a logistics broker, Continental Logistics ("Continental"), contacted J.V. & Sons to provide hauling services to Continental's client. J.V. & Sons hauled for Continental Logistics for 22 days, performing a total of 94 loads. [Gleekel Decl., Ex. 53].

Through Continental, J.V. & Sons performed hauls for Delek US Holdings ("Delek"). Mr. Conners testified in his deposition that J.V. & Sons had also hauled oil for Delek prior to working for AVL. [Conners Dep. 70:11–24]. Mr. Holwell testified similarly, stating that Delek actually introduced J.V. & Sons to AVL. [Holwell Dep. 232:1–233:25]. However, neither party disputes that Delek was AVL's client while J.V. & Sons performed hauls for AVL. On behalf of Continental, J.V. & Sons hauled 47 loads for Delek over nine days. [Gleekel Decl., Ex. 53].

J.V. & Sons did not communicate to AVL that it was hauling for Delek through Continental. However, J.V. & Sons did not obtain new permissions to access Delek sites; instead, it used its previous permissions to access the Delek site. [Def.

Opp'n at 6–7]. "In addition, during J.V. & Sons' business relationship with Continental, J.V. & Sons forwarded emails received from AVL to Continental." [*See*, *e.g.*, Ex. 28].

### D. End of the Business Relationship

In February 2020, AVL stopped paying J.V. & Sons for their hauls. 108:14-114:24]. J.V. & Sons continued to haul for AVL until March, and repeatedly requested that AVL pay them for the work done. AVL assured them that they would be paid on multiple occasions. [*See* Gleekel Exs. 37, 40, ECF No. 71-1]. Finally, J.V. & Sons sent AVL an email purporting to terminate their business relationship, and when AVL continued to withhold payment, filed this lawsuit. [Gleekel Ex. 29, ECF No. 71-1]. In total, J.V. & Sons states that AVL has not paid the balance for eight invoices in February and March, numbered 1033–1036.[1] ETX/WTX, amounting to $334,940.08. In addition, based on AVL's "Vendor Balance Detail Report," a spreadsheet listing their transactions with J.V. & Sons, shows that a total of $6,194.97 remains unpaid from previous invoices.  [Gleekel Ex. 1, ECF No. 72].

### E. Procedural History

J.V. & Sons brought this case against AVL in a Texas State court, on June 24, 2020. [Index to AVL's Notice of Removal, ECF No. 4]. AVL removed the case to the Northern District of Texas on July 27, 2020, pursuant to 28 U.S.C. §§ 1332(a)(1),

---

[1] Each number corresponds to two invoices; one for East Texas, and the other for West Texas. [*See* Gleekel Ex. 41–48].

1441(b), and 1446 under diversity jurisdiction. [Notice of Removal at 2–3, ECF No. 1]. This case was transferred to the District of Minnesota on December 15, 2020. [ECF No. 25].

## II.   DISCUSSION

J.V. & Sons seeks summary judgment for breach of contract and dismissal of AVL's counterclaims for breach of contract and recoupment. AVL moves for summary judgment solely on Count I of its counterclaims, in which it asserts that J.V. & Sons breached the August 2019 QuickPay Agreement.[2]

### A.  Legal Standard

---

[2] As the Court is sitting in diversity, it must first determine whether to apply Minnesota or Texas law to the issues at hand. Because the parties originally briefed these motions with Texas law and did not provide a choice of law analysis in their briefing, the Court requested that the parties supplement the record regarding choice of law. [ECF No. 136].

Where, as here, a case has been transferred pursuant to § 1404(a) under a forum selection clause, courts apply the choice of law rules of the transferee state. *See Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 65–66 (2013) ("The court in the contractually selected venue should not apply the law of the transferor venue to which the parties waived their right."). In Minnesota, choice-of-law issues are determined on an "issue-by-issue, and not case-by-case, basis." *Zaretsky v. Molecular Biosystems, Inc.*, 464 N.W.2d 546, 548 (Minn. Ct. App. 1990).

After reviewing the parties' arguments, the Court is satisfied that it may apply Texas law to the entire matter at hand. The parties have stipulated, and the Court agrees, that Texas law applies to any analysis regarding the QuickPay Agreement pursuant to its choice of law clause. [ECF No. 141]. Regarding J.V. & Sons' common law claims, the parties stipulate that to the extent the Court would be required to apply Minnesota law under *Atlantic Marine*, no outcome-determinative conflict exists between Minnesota and Texas law. [*Id.*] Accordingly, the Court will apply Texas law.

A movant is entitled to summary judgment where "no genuine dispute as to any material fact [exists] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If no reasonable jury could find in favor of the nonmovant, there is no genuine dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are only those "that might affect the outcome of the suit under the governing law." *Id.* Where there is a genuine dispute of facts, those facts should be viewed in the light most favorable to the non-moving party. *E.g., Scott v. Harris*, 550 U.S. 372, 380 (2007). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021).

On cross-motions for summary judgment, the Court assesses the facts under each motion separately. *Progressive Preferred Ins. Co. v. Est. of Stover*, 485 F. Supp. 3d 1043, 1046 (D. Minn. 2020). Where J.V. & Sons is the movant, the Court views the facts in the light most favorable to AVL, and vice versa. *Id.* "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law. *Seaworth v. Messerli*, No. 09-cv-3437 (RHK/LIB), 2010 WL 3613821, at *3 (D. Minn. Sept. 7,

2010), *aff'd*, 414 F. App'x 882 (8th Cir. 2011) (quoting *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir.2002)).

**B. The QuickPay Agreement**

AVL seeks summary judgment on its affirmative defense that J.V. & Sons cannot recover for breach of contract because it violated the QuickPay Agreement's non-solicitation provision by working with Delek and Jason Barnett while hauling for Continental, J.V. & Sons. AVL further argues that it is entitled to summary judgment on J.V. & Sons' claims because the latter violated the QuickPay Agreement's non-disclosure provision by sharing AVL-provided information with Continental. J.V. & Sons also seeks summary judgment on AVL's breach of contract counterclaim under the QuickPay Agreement, arguing that the QuickPay Agreement is illusory, and in the alternative, that the non-solicitation and non-disclosure provisions are unenforceable.

Breach of contract claims in Texas are governed by familiar elements: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Martin Res. Mgmt. Corp. v. Fed. Ins. Co.*, No. 20-40571, 2021 WL 4269565, at *3 (5th Cir. Sept. 20, 2021) (quoting *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (quoting *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App. 2005)).

**1. Contract Validity**

When interpreting a written contract, courts examine and consider the entire writing with the intent of "giv[ing] effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (emphasis in original). "When we have the choice of construing a contract as valid or as void, we construe it in such a way as to make it valid." *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 722 (Tex. App. 2008); *accord. Mays v. Pierce,* 154 Tex. 487, 494 (1955).

Despite J.V. & Sons' arguments to the contrary, the QuickPay Agreement constitutes an enforceable contract. Contract formation requires offer, acceptance, and consideration. *St. David's Healthcare P'ship, LP v. Fuller*, 627 S.W.3d 707, 710 (Tex. App. 2021). There is evidence to support a finding as to each of these elements.

Lack of consideration in the original contract is not necessarily fatal. Texas law permits contracts that set the guidelines for future agreements to become enforceable at the point that those future contracts are created. These contracts are not binding alone, but "set[] out the rules of the game in the event the parties decide to play ball." *Matte v. Zapata Offshore Co.*, 784 F.2d 628, 630 (5th Cir. 1986) (quoting *Page v. Gulf Oil Corp.*, 775 F.2d 1311, 1315 (5th Cir. 1985)). They are valid and enforceable under Texas law, so long as the parties enter into the agreements contemplated in the original contact. *See ODL Servs., Inc. v. ConocoPhillips Co.*, 264 S.W.3d 399, 414 (Tex. App. 2008) (describing that a "master service agreement" which became binding only upon the request for services); *Shell W. E & P, Inc. v. Pel-State Bulk Plant, LLC*, 509

11

S.W.3d 581, 587 (Tex. App. 2016) ("A master service agreement . . . requires the issuance of work orders and, upon acceptance of the work orders, they become part of the master service agreement.").

Texas courts have previously found factoring agreements to constitute enforceable agreements when coupled with future exchanges of promises. For example, in *Allied Capital Partners, LP v. Proceed Technical Resources, Inc.*, 313 S.W.3d 460, 463 (Tex. App. 2010), the agreement at issue established the guidelines for a factoring arrangement, and "contemplate[d] a series of offers by [Defendant] to sell invoices and acceptances by [Plaintiff], with neither party under an obligation to offer or accept." *Id.* at 465–66. The court interpreted the contract as a series of enforceable exchanged promises falling under the purview of the factoring agreement, with each exchange being individually enforceable on the terms of the factoring agreement. *Id.*

That the parties intended the QuickPay Agreement to be enforced through the creation of future agreements is plainly written in its terms. The QPA states that it governs "the general terms and conditions under which, from time to time during the Term, [J.V. & Sons] may offer and sell certain Receivables [the invoices] to [AVL]." [QPA § 2.1]. It provides that each time J.V. & Sons seeks to factor its invoices with AVL, it must execute an "Assignment and Transfer of Receivables substantially in the form of" a form attached to the Agreement, essentially forming an offer. [*Id.* at § 2.2]. AVL accepts this offer by sending an electronic acceptance and the advance of 90% of the invoice payment to J.V. & Sons. [*Id.*] Nothing in the Agreement obligates either

12

party to enter into this factoring arrangement; it merely sets the guidelines if they decide to do so. And it expressly states that "[e]ach sale and purchase of Receivables shall be subject to all of the terms and conditions of this Agreement." [*Id.* § ???].

Importantly, the record shows that neither party substantially followed the above procedure. There is no evidence in the record that J.V. & Sons filled out or sent AVL the form attached to the QuickPay Agreement for any of its invoices. Instead, Mr. Conners testified that he simply emailed completed invoices to AVL. Nor did AVL follow the established procedures—instead of sending J.V. & Sons a confirmation and an advance of 90% of the invoice, AVL simply sent the total amount of 97% of the purchase price within 30 days of receiving the invoice.

We first look to the language of the QuickPay Agreement to determine whether these deviations preclude the application of the QuickPay Agreement to the parties' transactions. Courts interpret contractual terms under their "plain, ordinary, and generally accepted meaning unless the contract shows the parties used them in a technical or different sense." *City of The Colony*, 272 S.W.3d at 722. Under these guidelines, the Court interprets the "Assignment" clause to allow the parties to create an offer and acceptance under the QuickPay Agreement without using the specific prescribed form. The inclusion of the words "substantially in the form of" in § 2.2 indicate to the Court that the parties were not strictly limited to use of that specific form. The separate statement that *any* sale and purchase of the invoices "shall be subject" to the QuickPay Agreement lends support to this interpretation, because as

13

written, this would include transactions in which the parties did not follow the rules specified in the Assignment clause. Accordingly, when the AVL factored J.V. & Sons' first invoice, even though neither party made the offer and acceptance in the exact way specified in the contract, the QuickPay Agreement's terms governed those transactions.

With the QuickPay Agreement incorporated into its future agreements, J.V. & Sons' arguments that the QuickPay Agreement is illusory for lack of consideration are easily countered. J.V. & Sons is correct that alone, the QuickPay Agreement does not impose obligations on each party. If the Court read the QuickPay Agreement under their interpretation, it would impose obligations on J.V. & Sons—through its requirements for exclusivity, non-disclosure, and non-solicitation—regardless of whether AVL agreed to factor any of J.V. & Sons' invoices. But reading the contract as incorporated into the parties' future factoring agreements, there is sufficient evidence of consideration. Indeed, J.V. & Sons was paid within 30 days, a faster timeline than anticipated, and AVL received a 3% fee for factoring the agreement. As a matter of law, this evidence establishes J.V. & Sons is not entitled to summary judgment on the broad question of the validity of the QuickPay Agreement because a reasonable jury could find it is enforceable.

### 2. Enforceability of the Restrictive Covenants

J.V. & Sons argues that even if the QuickPay Agreement is enforceable, the two restrictive covenants in the Agreement—the non-solicitation provision and the

non-disclosure provision—are unenforceable under Texas law. AVL also moves for summary judgment on its related defenses, arguing that both provisions are enforceable and fair.

### a. Non-Solicitation Provision

The enforceability of restrictive covenants is a question of law. *Neurodiagnostic Tex, L.L.C. v. Pierce*, 506 S.W.3d 153, 163 (Tex. App. 2016). Contractual provisions which function as a restraint on trade are governed by the Covenants Not to Compete Act, Tex. Bus. & Com. Code § 15.50(a). *Ortega v. Abel*, 562 S.W.3d 604, 610 (Tex. App. 2018). Non-solicitation provisions, such as the one at issue here, are governed by this Act and subject to the same analysis as other covenants not to compete. *Shoreline Gas, Inc. v. McGaughey*, No. 13-07-364-CV, 2008 WL 1747624, at *10 (Tex. App. Apr. 17, 2008).

Texas law permits reasonable non-compete clauses, so long as they follow certain statutory restrictions. Non-compete agreements, like the non-solicitation provision included in the QuickPay Agreement, must: (1) be "ancillary to or part of an otherwise enforceable agreement" and any restrictions on geography and time limitations (2) must not "impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code Ann. § 15.50(a).

In determining the first requirement, Texas courts separates its inquiry into two questions: (1) whether there is an "otherwise enforceable agreement"; and (2) whether

the covenants are "ancillary or part of" that agreement. *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 771 (Tex. 2011). The first inquiry is satisfied here, because the non-solicitation provision is part of the QuickPay Agreement, which contains "mutual non-illusory promises." *Id.* at 773.

With respect to the second inquiry, a covenant is "ancillary or part of" an agreement if it meets two requirements. First, AVL must demonstrate that "consideration given by [AVL] in the agreement is reasonably related to an interest worthy of protection." *Neurodiagnostic Tex.*, 506 S.W.3d at 164. Examples of interests that have been found worthy of protection include: "[b]usiness goodwill, confidential or proprietary information, trade secrets, customer information, and specialized training." *Titan Oil & Gas Consultants, LLC v. Willis*, 614 S.W.3d 261, 267 (Tex. App. 2020) (collecting cases), *review denied* (Sept. 3, 2021). Second, AVL must demonstrate that "the covenant not to compete was designed to enforce [J.V. & Sons]'s consideration or return promise in the agreement." *Pierce*, 506 S.W.3d at 164. "Unless both elements of the test are satisfied, the covenant cannot be ancillary to or a part of an otherwise enforceable agreement, and is therefore a naked restraint of trade and unenforceable." *Titan Oil*, 614 S.W.3d at 267.

AVL has identified several different exchanges that it contends act as consideration for the non-solicitation provision. It argues that J.V. & Sons accepted the non-disclosure agreement "[i]n exchange for getting paid more quickly[.]" [Def. Mem. at 7]. It also argues that "it was designed to prevent Plaintiff from breaching

16

the separate promise of non-disclosure and to protect AVL's goodwill." Finally, it argues that the non-disclosure provision is supported by "consideration implicit in the parties' relationship," namely, that "AVL permitted Plaintiff to haul for its customers, conducted the necessary work to qualify Plaintiff to haul oil and to obtain the necessary permissions to access customer sites, and gave Plaintiff access to Confidential Information (as defined by the Agreement) in the process." [Def. Reply at 11, ECF No. 126]. AVL states that absent the QuickPay Agreement, AVL would not have given J.V. & Sons access to the confidential information, and that the Agreement allowed J.V. & Sons to access work, such as hauling work for Delek, that it "would not otherwise have access to." [Def. Opp'n at 27, ECF No. 116].

The record before the Court expressly contradicts AVL's claim that J.V. & Sons would not have had access to the confidential information or hauling work for Delek without the QuickPay Agreement.[3] As the "Confidential Information" defined in the QuickPay Agreement is so broadly written that it covers all information that J.V. & Sons could view or observe while working for AVL, J.V. & Sons had access to this information for two months prior to signing the QuickPay Agreement by conducting hauls for AVL. AVL has not contended that it provided J.V. & Sons with any more confidential or internal information as a result of the QuickPay Agreement,

_____

[3] Indeed, AVL's statement in their opening brief, that "the provision protects against . . . JV&SONS using the connections it made through its work for AVL to help steal crude oil hauling business from AVL[,]" [Def.'s Mem. at 23, ECF No. 106], sums up the more likely reasoning behind the inclusion of the non-solicitation provision.

nor has it pointed to any evidence in the record that would corroborate such a contention. In addition, AVL had repeatedly dispatched J.V. & Sons on hauls for Delek for nearly a month prior to signing the QuickPay Agreement, demonstrating that AVL did not allow J.V. & Sons to haul for Delek in exchange for their signing of the QuickPay Agreement. [*See* Gleekel Decl., Exs. 21–23]. As every first-year law student knows, "past consideration is not consideration." *Purselley v. Lockheed Martin Corp.*, 322 F. App'x 399, 402 (5th Cir. 2009) (cleaned up). Therefore, AVL's assertions that its provision of confidential information and access to work were in consideration of the QuickPay Agreement is unavailing.

Even assuming that AVL did provide J.V. & Sons with confidential and internal information sufficient to act as consideration for the non-solicitation provision, the Court fails to see how the provision was designed to enforce J.V. & Sons' return promises. AVL argues that the non-solicitation provision was "designed to prevent Plaintiff from breaching its separate promise of non-disclosure of Confidential Information." [Def.'s Reply at 12, ECF No. 126]. But the non-solicitation provision would only enforce the non-disclosure provision with AVL's clients and those that it had introduced J.V. & Sons to—J.V. & Sons had free reign to work with AVL's competition so long as they did not work with these groups. We fail to see how prohibiting J.V. & Sons from engaging only with AVL's client base, but not their competitors, would protect their confidential information and enforce J.V. & Sons' return promise.

Although AVL attempts to distinguish *Titan Oil*, its facts are informative and its reasoning applicable to the current case. In *Titan*, the plaintiff worked with one of the defendant's clients, and received confidential information from that client. 614 S.W.3d at 270. The covenant not to compete restricted the plaintiff from working with that client, and the defendant argued that the covenant was designed to enforce a provision not to disclose that confidential information. *Id.* The court first noted that the plaintiff was free to work with any and all of the defendant's competition, and the noncompete therefore did not protect against disclosure of confidential information the majority of players in that market. *Id.* AVL attempts to distinguish its own non-solicitation provision by reiterating that it provided J.V. & Sons with training, permissions, access to customers, and confidential information because it signed the QuickPay Agreement. But as stated above, this is not reflected in the record. Rather, the same issue noted in *Titan* arises in AVL's non-solicitation agreement— it only prevents J.V. & Sons from disclosing confidential information to AVL's own clients, not its competition.

For these reasons, the Court finds that the non-solicitation provision is an impermissible restraint of trade, and is unenforceable under Texas law.

### b. Non-Disclosure Provision

AVL next invokes the non-disclosure provisions of the QuickPay Agreement, asserting that non-disclosure provisions are not governed by the same analysis as non-solicitation clauses. It is correct that in the majority of cases, where non-disclosure

agreements are limited to protection of "trade secrets, confidential information, and proprietary information," they are not considered non-compete agreements. *McGowan & Co. v. Bogan*, 93 F. Supp. 3d 624, 636 (S.D. Tex. 2015).

This general rule has one exception: a non-disclosure provision is treated as a non-compete covenant if it "prohibit[s] the former employee from using, in competition with the former employer, the general knowledge, skill, and experience acquired in former employment." *Marquis Software Sols., Inc. v. Robb*, No. 3:20-CV-0372-B, 2020 WL 955901, at *9 n.7 (N.D. Tex. Feb. 27, 2020) (quoting *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 663 (Tex. App. 1992)); *accord. Courtroom Scis., Inc. v. Andrews*, No. 3:09-CV-251-0, 2009 WL 1313274, at *10 (N.D. Tex. May 11, 2009) (applying analysis for non-compete agreements to a non-disclosure provision that met the above requirement); *Oxford Glob. Res., Inc. v. Weekley-Cessnun*, No. CIV.A. 3:04-CV-0330-, 2005 WL 350580, at *2 (N.D. Tex. Feb. 8, 2005) ("An agreement prohibiting a former employee in this field from disclosing his acquaintances would therefore be a noncompetition agreement in disguise, and would be unenforceable as such."); *Thoroughbred Ventures, LLC v. Disman*, No. 4:18-CV-00318, 2018 WL 3752852, at *4 (E.D. Tex. Aug. 8, 2018); *cf. Baker Petrolite Corp. v. Spicer*, No. 06-1749, 2006 WL 1751786, at *8–9 (S.D. Tex. June 20, 2006) (finding that confidential or proprietary information protected by a non-disclosure provision did not amount to "general

knowledge" and accordingly did not analyze the provision under the Covenants not to Compete Act).[4]

The non-disclosure provision before the Court prevents J.V. & Sons from "(a) disclos[ing] any Confidential Information to any other person or (b) us[ing] any Confidential Information for the [J.V. & Sons'] own benefit or for the benefit of any other person or entity, in each case without [AVL]'s express prior written consent." [QPA § 14.4]. It defines "Confidential Information" as "all information, whether written or oral, that is disclosed or made available to Seller directly or indirectly, through any means of communication, including Seller's observations by virtue of opportunities provided to Seller by Purchaser." [*Id.*].

The language of the non-disclosure provision—specifically, its definition of Confidential Information—is astoundingly broad. It restricts not only the disclosure of trade secrets or proprietary information, but also the disclosure or *use* by J.V. & Sons of its own observations while conducting hauls for AVL. Under this provision, J.V. & Sons would be unable to use any of the information that its personnel happened to learn while performing hauls for AVL in any future hauling, such as skills for navigating road or weather conditions, basic directions to different hauling sites, and routine safety procedures. As pointed out by J.V. & Sons, the provision would

---

[4] AVL argues that J.V. & Sons failed to point to a single Texas case where a non-disclosure provision was treated as a non-compete covenant. As evidenced by the caselaw found by the Court, J.V. & Sons' arguments were correct, even if its citations were lacking.

prohibit them from using publicly available information, and "disclosing information regarding its financial transactions with AVL to its attorney, accountant, or other business advisors without AVL's prior written consent." [Pl. Opp. at 10]. Therefore functionally, if not in the name assigned to it, the non-disclosure provision restricts J.V. & Sons' ability to perform any hauling for other parties in the future given its breadth. *See Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 599–600 (Tex. App. 1995) (treating a non-disclosure covenant whose "purpose and effect . . . parallel those inherent in a noncompete agreement" as a covenant not to compete).

Applying the same test described above to the non-disclosure provision, the non-disclosure provision is unenforceable for lack of reasonable restrictions. "To be enforceable, a noncompete covenant must contain reasonable limitations as to time, geographical area, and scope of activity to be restrained." *Zep Mfg. Co.*, 824 S.W.2d at 660. The non-disclosure provision contains neither geographical nor temporal restrictions, and is therefore unenforceable. *See id.* (holding that a non-compete covenant was unenforceable because it contained no geographic limitation); *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793–94 (Tex. App.2001) ("A covenant not to compete with a broad geographical scope is unenforceable[.]"). Indeed, it contains no real limits at all. And the Court declines to read such limitations into the language of the agreement.

As both restrictive covenants are unenforceable as a matter of public policy, the Court need not decide whether J.V. & Sons breached the QuickPay Agreement.

AVL's motion for summary judgment is denied with respect to its affirmative defenses, and J.V. & Sons' motion is granted regarding the same.

## C. Hauling Agreements

J.V. & Sons seeks summary judgment on Count 1 of its Complaint, that AVL breached a contract with J.V. & Sons for failing to compensate it for the transportation of oil for eight unpaid invoices in February and March 2020, and unpaid balances on prior partially paid invoices. The parties agree that AVL has not paid these unpaid balances. Instead, AVL challenges the existence of a contract on the basis that it does not include requisite contract formalities, such as signatures, and for indefiniteness. As J.V. & Sons seeks summary judgment, the Court will view the facts in the light most favorable to AVL.

Generally, contract formation "requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *James River Ins. Co. v. Janmark Res., Inc.*, No. CV H-20-4365, 2022 WL 1093808, at *3 (S.D. Tex. Apr. 12, 2022) (quoting the Restatement (Second) of Contracts § 17 (1981)). Mutual assent to the exchange is established through "(1) an offer, (2) acceptance of the offer, (3) mutual assent or 'meeting of the minds' regarding the subject matter and essential terms of the contract, and (4) consideration, or mutuality of obligations." *Kottke v. Scott*, No. 03-10-00071-CV, 2011 WL 1467194, at *2 (Tex. App. Apr. 14, 2011).

Further, "even if an offer and acceptance are not recorded on paper, dealings between parties may result in an implied contract where the facts show that the minds

of the parties met on the terms of the contract without any legally expressed agreement." *Fraud-Tech, Inc. v. Choicepoint, Inc.*, 102 S.W.3d 366, 386 (Tex. App. 2003) (quoting *Ishin Speed Sport, Inc. v. Rutherford,* 933 S.W.2d 343, 348 (Tex. App. 1996)). For an implied contract, courts look to the "meeting of the minds of the parties as implied from and evidenced by their conduct and course of dealing." *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972).

J.V. & Sons has placed enough undisputed evidence in the record for the Court to conclude that, as a matter of law, an implied contract governed their hauling arrangements with AVL. The rate sheets and the cited communications between the parties, demonstrate a meeting of the minds that AVL would pay JVS for the hauls that it committed on their behalf, at price points established in the rate sheets. Both Mr. Conners and Mr. Holwell testified in their depositions that they expected that the rate agreements set the payment terms for future invoices. [Conners Dep. 190:17–23; Holwell Dep. 172:2–25 ("I think it's an agreement, like this is my expectation of when you invoice me, this is what you're going to invoice me."); *see also*, Def.'s Ans. to Pl. Interrogs. at 15 ("Defendant admits that the haul rates were agreed to by the parties[.]")].

AVL's prior conduct and course of dealing with J.V. & Sons supports the conclusion that the parties intended to enter into a binding agreement when accepting the hauls. Over the course of hundreds of hauls, J.V. & Sons followed the same pattern. Mr. Conners testified to the fact that over their months working together,

24

AVL dispatched hauls to J.V. & Sons, which J.V. & Sons then accepted, and after completing the haul, J.V. & Sons invoiced AVL using the rates from the rate sheets.

J.V. & Sons has demonstrated that it performed its obligations under the agreement. Restatement (Second) of Contracts § 34 (1981) ("Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed."). Indeed, J.V. & Sons has also shown that the parties both repeatedly performed as if there was a binding agreement governing their actions. Restatement (Second) of Contracts § 223 (1981) ("Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement."). AVL's Vendor Balance Report follows the sheet pricing, and demonstrates that AVL consistently paid J.V. & Sons for its services based on the rate agreements. [Gleekel Decl., Ex. 95, ECF No. 132-4]. J.V. & Sons kept detailed invoices, which calculated payment based on the pricing terms of the applicable rate sheet, and contained notes memorializing the specifics of each haul. [Gleekel Decl., Exs. 43–48].

Finally, the record demonstrates that Mr. Holwell believed that he was obligated to pay J.V. & Sons for its hauling services. In an email and a set of text messages between Mr. Holwell and Mr. Conners, Mr. Holwell twice stated that Mr. Conners would be paid for the invoices at issue. [*See* Gleekel Decl., Ex. 38; ECF No. 93; Gleekel Decl., Ex. 40, ECF No. 71-1].

Regarding the additional $6,194.97 that J.V. & Sons argues remain unpaid outside of the eight unpaid invoices discussed, J.V. & Sons solely points to the AVL Vendor Balance Detail Report to show that AVL has outstanding payments. As argued by AVL, J.V. & Sons makes almost no effort to argue or support its contentions that this record accurately reflects outstanding payments, or that AVL breached an agreement with J.V. & Sons by failing to pay these outstanding amounts. Therefore, a genuine issue of material fact exists as to these outstanding payments, and summary judgment would be improper for these claims.[5]

## III.   CONCLUSION

For the foregoing reasons, AVL's Motion for Summary Judgment is **DENIED.** J.V. & Sons' Motion for Summary Judgment is **DENIED** with regard to the alleged outstanding $6,194.97 in payments and **GRANTED** as to all other claims.

**IT IS SO ORDERED**.

Date: September 15, 2022                             *s/ Katherine Menendez*
                                                     Katherine Menendez
                                                     United States District Judge

---

[5] The Court notes that AVL includes in its Opposition an argument against awarding attorneys' fees to J.V. & Sons. [Def.'s Opp'n at 15–16]. Although J.V. & Sons mentioned attorney's fees in its briefing, it clarified on Reply that it did not intend to have the Court assess the merits of its request at this time. [Pl.'s Reply at 3, n.5]. Therefore, the Court agrees that addressing this question is premature and will not do so for the purposes of this motion.